BURCH v. MOUNTS. (No. 951.)

(Court of Civil Appeals of Texas. Amarillo. April 12, 1916. Rehearing Denied May 10, 1916.)

1. EXECUTION ⬤�ancⵗ127—LEVY—"POSSESSION."
Under Rev. Civ. St. art. 3740, providing that a levy upon personal property is made by taking possession thereof when the defendant in execution is entitled to the possession, "possession" implies a condition in which not only is one's dealing with the thing physically possible, but every other person dealing with it is capable of being excluded; the doing of such an open act, susceptible of proof, that the officer would be a trespasser, but for the protection of the writ; a possession according to the character of the goods, not necessarily a manual possession or a removal of the property, after the officer has it in his power or control.

[Ed. Note.—For other cases, see Execution, Cent. Dig. §§ 282–286; Dec. Dig. ⬤⟩127.

For other definitions, see Words and Phrases, First and Second Series, Possession.]

2. EXECUTION ⬤⟩129—LEVY ON CATTLE—POSSESSION—STATUTE.
Under such provision the sheriff's levy on a number of cattle made openly, and after notice to the execution debtor, by having the caretaker point out those not belonging to the debtor, by driving them to a point in the inclosure where they might be counted, the brand taken, and a note thereof made, notwithstanding he left them in the inclosure until he could make an additional levy on other cattle, in view of his agreement with the debtor on the same day as to the pasturage, and his removal of them from the pasture on the following day, was a sufficient taking of possession to constitute a valid levy.

[Ed. Note.—For other cases, see Execution, Cent. Dig. §§ 290–304; Dec. Dig. ⬤⟩129.]

3. CHATTEL MORTGAGES ⬤⟩147—GOOD FAITH—NOTICE OF INTENDED LEVY.
The mortgagee in a chattel mortgage of cattle who had been told that a levy was going to be made under an execution against his mortgagor, and who endeavored to get the mortgage executed and filed before the levy, was not an innocent lienholder.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. § 242; Dec. Dig. ⬤⟩147.]

Appeal from District Court, Deaf Smith County; D. B. Hill, Judge.

Action by R. N. Mounts against J. P. Burch and J. H. Bowers. Judgment for plaintiff against defendant Bowers for the principal due on a note, foreclosing a chattel mortgage on cattle against both defendants, with execution against defendant

Burch for the sum recovered for conversion of the cattle, and defendant Burch appeals. Affirmed in part, and reversed and rendered for defendant Burch.

Gilliland & Estes and Russell & Dameron, all of Hereford, for appellant. Knight & Slaton, of Hereford, for appellee.

HUFF, C. J. The appellee, Mounts, instituted this suit in the district court of Deaf Smith county, against J. P. Burch and J. H. Bowers. He declared on a note executed by Bowers and secured by a mortgage lien. The note was for $576.50, and the lien sought to be foreclosed on 80 head of cattle; that the mortgage was executed June 21, 1915, and thereafter that Burch caused the cattle to be levied on by the sheriff under an execution and sale, and that Burch refuses to recognize the validity of Mount's mortgage. He prayed for judgment against Bowers on the note, interest and attorney's fees, and against Burch for a foreclosure of the mortgage lien, and in the alternative, in the event that it should be found that Burch had removed the cattle from the confines of Deaf Smith county, recover damages for conversion, and for judgment against Burch for the value of the cattle.

Burch answered by general and special exceptions, and at the May term of the district court he recovered a judgment against Bowers for the sum of $2,400, and that on the 19th day of June, 1915, the clerk of the court issued an execution on this judgment and delivered it to the sheriff of Deaf Smith county, who levied on Bowers' cattle, among which were the cattle described in plaintiff's petition, and in his mortgage, on the 21st day of June, 1915, at 7:30 o'clock a. m., and thereafter advertised and sold the cattle July 6th, at which sale he became the purchaser and the cattle were delivered him by the sheriff, and other matters not necessary to set out.

The case was submitted to the jury upon special issues, and upon these issues and the jury's findings the trial court rendered judgment for Mounts against Bowers, for the principal due on the note, together with interest and attorney's fees, and foreclosed the mortgage lien on the cattle as against him and Burch, and also rendered a judgment that Mounts have execution against Burch for the sum recovered for conversion of the cattle. The judgment is in the alternative in several respects, which we will not discuss, as the case will be disposed of on other grounds. The facts in this case show that J. H. Bowers was indebted upon a promissory note, payable to R. N. Mounts, in the sum of $576.50, dated April 1, 1915, and due October 1st, thereafter. To secure the payment of this note Bowers executed a mortgage on the 21st day of June, 1915, on 79 head of three year old steers, subject to a former mortgage. This mortgage was filed June 21, 1915, at 8:18 o'clock a. m. It appears that on the 19th day of June, 1915, an execution was issued out of the district court of Deaf Smith county, on a judgment in favor of J. P. Burch against J. H. Bowers, for $2,408.15, with interest due thereon; the judgment having been rendered May 20, 1915. The return on the execution shows that it was placed in the hands of the sheriff, R. W. Baird, on the 19th day of June, 1915, at 3 o'clock p. m.; the return thereon further showing that he executed the same by levying and taking into his possession 79 head of three year old steers. The brands on the cattle are described the same as they are described in the mortgage, and it is admitted they are the same cattle. There was also levied on 10 head of two year old steers and 57 yearling steers, not included in this controversy. The 79 head of steers, the return recites, were levied on at 7:30 o'clock a. m., June 21, 1915. The cattle were properly advertised June 25, 1915, to be sold in that county July 6, 1915, at the Frank Bassett place, and that 79 steers and 1 cow were sold at that time and place to J. P. Burch for $5.50 per head, which were delivered to Burch by the sheriff. On the morning of June 21, 1915, the sheriff and Burch, the judgment plaintiff, went east of the town of Hereford and found the 79 head of steers in a one-section pasture. The cattle were scattered over the pasture and some grazing in the creek. The sheriff says he found a man on the place in charge of it, and that he made two counts of the cattle and did not leave the cattle in charge of any one, but assumed charge of them himself, and appointed no one to take charge of them, but that he saw and counted them and then left them to go to other places and levy on additional cattle; that he did not round them up in a bunch or at that time drive them anywhere, only out of the creek up where he could count them; that he took charge of them himself but did not stay with them. He testifies that he did not go back until the next Tuesday or Wednesday—he was not positive which day. The levy was made on Monday. When he returned he took them off to the Bassett pasture. The yearlings levied on were in a different pasture south of the town, and it appears from his testimony that the sheriff and Bowers went to levy on the yearlings in the afternoon of the day of the levy on the steers. He says he would not be positive that he told Bowers of the levy on the steers, but that he talked to him the Sunday before the levy, telling him that he had the execution and that he possibly took it for granted Bowers knew of the levy, but he does say he told Bowers he had counted the cattle and they were all there. He further testified that in a conversation over the phone with Bowers, on Sunday, that he told Bowers in case he made the levy on the cattle that he wanted to leave the cattle with him, and Bowers said that would be all right.

The reason he did not move the cattle at that time, he thought he had permission from Bowers to leave them there. The reason he gave to Bowers, and to which Bowers assented, for leaving the cattle was that they would do better there than to move them. He moved them afterwards because Bowers requested on Tuesday after the levy that he do so. The facts show that the levy on the 79 head was first made, and the next was on the two year old steers near where the 79 were located. These cattle were all east of the town. The yearlings were the last levied on and were south of town in a different neighborhood. In the afternoon of the 21st of June, Bowers and the sheriff went to levy on the yearlings, and on their return the sheriff testifies they agreed on the pasturage. The cattle were considered in two classes: The charge for the yearlings was to be a cent a day, and the steers 1¼ or 1½ cents per day. The witness further states he went into the pasture and ran the cattle upon the hill and counted them, and at the time he did so made a memorandum of the number from which his return on the execution was afterwards typewritten. He noted the time of the levy by looking at his watch at the time of making it. There was a crippled steer and two cows and a calf in the pasture with this 79 head, which were not levied on. The sheriff called on the man on the place, who appears to have been in charge for Bowers, to point out the cattle not belonging to Bowers, and he pointed out 1 crippled steer, and the milk cattle were not levied on. Bowers testified that he did not agree or give the sheriff permission to leave the cattle in the pasture on Sunday when talking to him over the phone, but says:

"I did not make Mr. Baird a price for the pasturage of these cows until Monday. I told him at that time that I thought a cent a head or 1½ cents would be all right, but if he goes ahead and makes the levy we may make some trade and I will see you further."

Bowers, by his testimony, shows that he knew that the sheriff had the writ, and that unless he and Burch could settle the judgment the levy would be made, and was told of the writ in the phone conversation by the sheriff. He and Burch met on Sunday, when Burch told him he would levy that day unless he got his money. On Monday morning early he went to the home of Mounts and got him to go to a lawyer's office where they drew up the mortgage, executing it and filed it with the clerk of the county at 8:18 a. m. Bowers says:

"I got in a hurry to give that mortgage that morning because Mr. Baird had told me that John Burch was going to levy on the cattle or guessed that he would if he and I could not make a settlement."

He also testified the first time the sheriff told him about the cattle (as we infer he means about the levy) was 3 o'clock in the afternoon as they returned from making the levy on the yearlings. In another place,

however, he says the first time that he learned the cattle had been levied on was Tuesday the 22d of June, and that Mounts told him; that he then spoke to Baird and Baird said to him, "I thought you understood it;" that he told the sheriff that he (the sheriff) had not told him so. He also says that he understood Monday morning that Burch and the sheriff had gone to the pasture, but not until he had executed the mortgage. He says also that on Sunday he told Burch he would see him Monday and try to settle the judgment. He admits also that he told the sheriff on Tuesday the 22d to move the cattle out of the pasture, where they were when levied upon; that he did this after consulting his lawyers, and that he went with the sheriff on Wednesday to take the cattle out when they were moved to Bassett's pasture. Mounts admits that Burch, before the levy, told him (Mounts) about having the execution, and then asked him if he (Mounts) had any lien or mortgage on the cattle, and that he told Burch he had not. Burch then told him he was going to levy on the cattle. After detailing the circumstances of Bowers going to his residence Monday morning and offering to mortgage the steers, because he (Mounts) had that much in the cattle, etc., he further said that he walked in a hurry to the courthouse because he had other business. "My object was to get it here [courthouse] before the writ was levied if I could. I thought at that time the officers went out there to levy the writ Saturday." He also states that he did not know that the attorneys told him that morning that they were fixing to go out and make the levy, but said, "Burch told me Saturday evening." Bowers testified he had not seen the cattle since they were sold at the Bassett farm under the execution sale, and Mounts testified he had not seen the cattle since the day of sale. Further than this there is no evidence as to where the cattle were when the suit was brought or since that time.

The trial court submitted two questions to the jury, which, with the answers of the jury, are as follows:

"First. Did Bowers, in conversation over the phone with Sheriff Baird on Sunday, June 20, 1915, agree that in case Baird levied on the 79 cattle in controversy, said Baird might keep said cattle in the pasture where the same was then running after such levy was made? Ans.: No.

"Second. Did C. F. Baird, at the time he counted the said 79 head of cattle in controversy, on June 21, 1915, the first time finished doing so prior to 8:18 a. m.? Ans.: Yes."

We presume from the answers of the jury, and the facts, the trial court determined there was no legal levy; that is, within the meaning of the statute; the sheriff did not take such possession of the cattle as required. The appellant made a motion that the court render judgment in his favor, which was overruled.

[1] The first assignment is that the court

erred in overruling appellant Burch's motion to enter judgment in his favor and against Mounts as to Burch. "A levy upon personal property is made by taking possession thereof, when the defendant in execution is entitled to the possession." Article 3740, R. C. S. The officer making the levy shall securely keep the property, and if by his negligence injury is sustained by any party interested, he is liable for the value of the property. Article 3746, R. C. S. He is also required by the statutes to have the property upon which a levy is made present at the place advertised for the sale and in view of those attending the sale. Articles 3760–3762. All the requisites of the statute were complied with in this case, unless an immediate removal of the property from the place of levy to the place of sale is required, or there was no such possession as would constitute a levy. Under the facts in this case, was there such possession taken when the levy was made as will answer the statute? "By possession of a thing we always conceive the condition in which not only one's own dealing with the thing is physically possible, but every other person dealing with it is capable of being excluded. Thus the seaman possesses his ship but not the water in which it moves, although he makes each subserve his purposes." Rawle's Bouvier (3d Ed.) vol. 2, p. 2636. "We have seen that the levy is not complete until the sheriff gains control of the property. Although he may not take manual possession, he must be in a condition to do so." Kneeland on Attachments, § 475. This is illustrated where an officer in attempting to levy on a stock of goods situated in a house where the doors are closed or fastened so as to exclude his entrance, and he does not effect an entrance into where the goods sought to be levied upon are situated. The mere taking charge of the building from the outside is not a levy upon the goods. Lynch v. Payne, 49 S. W. 406; Taffts v. Manlove, 14 Cal. 47, 73 Am. Dec. 610. But if the officer enters and announces his levy by acts and words, the goods are then in his control, even though an inventory is not made of the goods at the time, he will be given a reasonable time in which to make the invoice and to remove the goods. Grove v. Harris, 35 Tex. 320–322; Caldwell v. Fifield, 24 N. J. Law, 150; Hill v. Harris, 10 B. Mon. (Ky.) 120, 50 Am. Dec. 542. This rests upon the fact that the goods must be seen by the officer and in such position that he can subject them to immediate possession. Upon this all the authorities agree. It has been stated in this state that the officers should do such an act as would, but for the protection of the writ, make him a trespasser. Bryan v. Bridge, 6 Tex. 137. In the case of Portis v. Parker, 8 Tex. 25, 58 Am. Dec. 95, it is said:

"The act of possession must be according to the nature of the property. If it be goods, for instance, they should be brought within his view, and be subject to his control; and he may take an inventory of them or perform some open and unequivocal act, in assertion of his title, which would operate to disturb and divest the possession of the defendant."

The assertion of the right must be open and susceptible of proof if called in question. It must not be secret so that third parties would be made victims of such secret act. The principles above announced are recognized in Gunter v. Cobb, 82 Tex. 598, 17 S. W. 848. The case of Cope v. Lindsey, 17 Tex. Civ. App. 203, 43 S. W. 29, Id., 91 Tex. 463, 44 S. W. 276, simply holds that a range levy cannot be made on cattle in an inclosure of 1,280 acres. The levy here made was not a range levy and it was not intended to be. "The property sought to be levied upon must be where he can exercise control over it; and he must exercise or assume to exercise dominion by virtue of his writ. He must do some act by reason of which he could be successfully prosecuted as a trespasser, if it were not for the protection afforded him by the writ. But in order to make him responsible as a trespasser, it is not essential that he should remove the property nor that he should touch it. It is enough that having the property within his view, and where he can control it, he does profess to levy and to assume control of the property by virtue of the execution and with the avowed purpose of holding the property to answer the exigencies of the writ, for one who, to that extent, assumes dominion over the goods of another, is a trespasser, unless he is justified by a valid writ. * * * The property must be within the power and control of the officer when the levy is made, and he must take it into his possession in a reasonable time thereafter and in such an open, public, and unqualified manner as to apprise everybody that it has been taken in execution." Freeman on Execution, vol. 2, § 260, pp. 1453, 1454.

[2, 3] This, we believe, indicates what acts are necessary to make a levy. At the time of the levy it can be conceived that in dealing with the cattle there was a physical possibility that others could be excluded. The cattle were confined in a small pasture and were driven to such a point that they could be counted and their brands taken. The caretaker of the cattle was called upon to point out those not belonging to Bowers. This he did, and 1 steer and the milk stock were excluded from the levy. The sheriff did not act secretly, but openly, after notice to Bowers that it would be done. He, at the time of counting the cattle and getting their brands, made a note of the number of cattle and the brands thereon. It is apparently urged here because the sheriff did not immediately remove the cattle or place some one there to guard them, or keep them, that it was not a possession then taken. The sheriff, at the time he declared the levy, had the cattle in view, and he professed to levy, and he testifies that he assumed the control and charge of the cattle by virtue of the writ.

In entering the inclosure of the defendant, driving the cattle to a point for the purpose of counting them, while armed with the writ, with which he professed to seize the cattle, would, we think, have made the sheriff a trespasser but for the writ. After so seizing them, we do not see how leaving the cattle in the inclosure until he could make an additional levy on the yearlings would release the levy. He had a reasonable time to reduce this levy to actual possession of the cattle. Battle Creek Bank v. National Bank, 62 Neb. 825, 88 N. W. 145, 56 L. R. A. 124; Boslow v. Shenberger, 52 Neb. 164, 71 N. W. 1012, 66 Am. St. Rep. 487. The afternoon on the day of the levy the sheriff and Bowers agreed to the pasturage on the cattle, and not until the next day, Tuesday, after Bowers had consulted with his attorneys, did he demand that the cattle be moved from the pasture. Bowers, we think, thus recognized that the sheriff had the right to move them, and that he had levied on them. Mounts is not an innocent lienholder; he had been told the levy was going to be made. The evidence shows that both Bowers and Mounts knew the sheriff was going to make the levy. They were in a hurry to get the mortgage executed and filed before the levy. The jury found the act of counting the cattle by the sheriff was 48 minutes before the mortgage was filed. If the sheriff had done nothing else, after finding the cattle and levying on them, but to move the cattle, he could not have gotten the cattle off of the place before the mortgage, and hence Mounts could then have claimed with equal consistency there was no notice by actual possession. He tried to get his mortgage before the levy, but failed. The cattle were moved in a reasonable time. If it shall be required of a sheriff to first round up and pen the cattle before he can make a levy, there would be but few valid levies. When he counts and takes the description of the cattle, followed by actual possession, within a reasonable time, or leaves them in the inclosure of the defendant, under an agreement to pay the pasturage, we see no reason why he has not performed his duty as an officer. After taking charge of them, as did the sheriff in this case, he would have been liable for their escape. The officer in this case had them at the place of sale on the day of sale. It occurs to us all was done in this case necessary to be done. The law ought not to require an unnecessary or an unreasonable thing. It was unnecessary to move the cattle from the inclosure where they were then situated, and it would be unreasonable to require this to be done before a place to care for them had been obtained. When Bowers notified the sheriff he would not keep the cattle, the sheriff then moved them.

We believe the court should have sustained the motion to render judgment for appel- lant, Burch. This court will therefore render such judgment on the motion as should have been rendered by the trial court. The case will be reversed and rendered in part, and affirmed in part.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes